NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0102n.06

**FILED**
Feb 19, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JAMES COITRONE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| BOBBY D. MURRAY; RICKI L. ALLEN; BRETT | ) | COURT FOR THE WESTERN |
| COOMES, individually, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE:     DAUGHTREY, ROGERS, and WHITE, Circuit Judges.

ROGERS, Circuit Judge.  James H. Coitrone, on a motorcycle, led Kentucky State Police Trooper Brett Coomes on a chase through the streets of Bowling Green, Kentucky.  The chase ended when Coomes's car collided with Coitrone's motorcycle.  Coitrone filed a 42 U.S.C. § 1983 action in federal district court, alleging that Coomes violated Coitrone's Fourth Amendment rights and alleging supplemental state-law claims for negligence and battery.  The district court granted summary judgment to Coomes, and Coitrone appealed.  The undisputed facts establish that Coomes's use of force did not violate Coitrone's Fourth Amendments rights.  The district court therefore properly granted summary judgment on this claim to Coitrone.  Coitrone's state-law claims require some additional analysis, and may warrant the district court's declining of supplemental jurisdiction.

On the morning of August 19, 2012, Coitrone planned to take his live-in girlfriend, Shasta McCollum, to church on Coitrone's motorcycle. After getting ready, Coitrone and McCollum left their home on Barren River Road in Bowling Green, Kentucky, and proceeded to their church on Coitrone's motorcycle with McCollum riding as passenger. Coitrone and McCollum were waiting at a stop light when Kentucky State Trooper Kevin Mayfield pulled up behind them. Mayfield ran Coitrone's license plate, revealing outstanding warrants for Coitrone for kidnapping, rape, sodomy, and bail jumping. After Coitrone proceeded through the intersection, Mayfield turned on his blue lights to indicate that Coitrone should pull over. Coitrone testified that after Mayfield flashed his lights, Coitrone slowed down and waved to Mayfield to let him know that Coitrone intended to stop, but did not stop because there were orange cones and pedestrians along the right side of the road. Coitrone testified that because he did not feel that there was any safe place for him to pull over, he turned right onto Russellville Road in order to stop.

Coitrone testified that he intended to stop when he saw that there were no cones on the right side of Russellville Road but kept going because he heard screeching tires and believed that the state trooper was going to strike him from behind. Coitrone became frightened, and decided to take McCollum, who was still riding on the back of his motorcycle, to a "safe place." After reaching a Wendy's, Coitrone pulled between a parking barrier and a tree to drop off McCollum. Coitrone testified that he did not get off of his motorcycle and speak with the state trooper at this time because he was "[s]cared to take an ass whooping" and "knew for sure they were gonna whoop [him]."

After Coitrone dropped off McCollum, he continued to flee down Dishman Lane. At some point, Dishman Lane turned into Cave Mill Road. Coitrone drove down Dishman Lane and onto Cave Mill Road at a speed of about 55 miles per hour in a 30-miles-per-hour zone.

Coitrone proceeded down Cave Mill Road until he came to a light at an intersection and took a left onto Smallhouse Road, a two-lane road in a residential area. At the time that Coitrone reached this intersection, Coomes, who had joined the pursuit of Coitrone after hearing Trooper Mayfield run Coitrone's license plate on the radio, was about to catch up with Coitrone. Coomes testified that he saw Coitrone run a red light during this left turn, although Coitrone does not recall doing so. As Coitrone drove down Smallhouse Road, he traveled in and out of the left lane in order to pass vehicles traveling in the right lane.

Coitrone proceeded down Smallhouse Road until he encountered Coomes's supervisor, Lieutenant John Clark, who had maneuvered his car onto Smallhouse Road to try to end Coitrone's flight from the police. Coitrone drove around Clark's car and continued driving on Smallhouse Road toward a large church called the Living Hope Church.

After observing Coomes pursue Coitrone through the intersection between Smallhouse Road and Campbell Lane, Clark put his car in drive and made sure that he got through the intersection safely. Clark then picked up his microphone and announced on the police radio that "it was time to terminate the pursuit." Clark ordered the pursuit to be terminated because he was concerned that there would likely be a large amount of traffic near the church. Clark testified that he later learned that no one, including Coomes, heard Clark's order to terminate the pursuit because it was covered up by other radio traffic.

Coomes did not observe that traffic had become heavier until he reached the top of the hill on Smallhouse Road where the church was located. Coomes decided to terminate the chase

if Coitrone had not stopped by the time Coitrone reached Highland Way, the next intersection on Smallhouse Road after Campbell Lane, because of the amount of vehicular and pedestrian traffic in the area.

Coitrone testified that he decided to "giv[e] up" his attempt to evade the police after crossing the intersection at Campbell Lane because he had observed the church traffic and "didn't want to hurt anybody coming from the church house [or] going to the church house." Coitrone testified that he let off the throttle and let his motorcycle coast in order to slow down as he approached the church, but Coomes testified that although Coitrone slowed abruptly, he showed no sign of intending to stop before Coomes struck the rear of his motorcycle.

Coomes testified that he tried to stop his vehicle after Coitrone slowed, but was unable to avoid striking the rear of Coitrone's motorcycle. In contrast, Coitrone testified that he believed that Coomes had tried to perform a precision immobilization technique in order to stop Coitrone. A precision immobilization technique is a "method of causing a [vehicle] to stop by ramming it not squarely from behind but instead at an angle, causing it to spin and stop." *Wourms v. Fields*, 742 F.3d 756, 758 (7th Cir. 2014) (internal citation omitted). Upon collision, Coitrone's motorcycle hit a concrete culvert and spun around multiple times, ejecting him onto the culvert. Coitrone alleges that as a result of this collision, he was hospitalized for over a month, placed into an induced coma, and suffered extensive life-threatening injuries, including multiple fractures of numerous bones and extensive soft tissue damage.

Coitrone subsequently filed suit in federal district court alleging that Coomes had violated his civil rights under 42 U.S.C. § 1983 by using unwarranted and unnecessary deadly

force in violation of the Fourth Amendment, and alleging supplemental state-law negligence and battery claims.[1] Coomes moved for summary judgment on all claims.

The district court granted summary judgment in favor of Coomes. *Coitrone v. Murray*, No. 1:13−CV−00132−GNS, 2015 WL 2384298 (W.D. Ky. May 19, 2015). The district court determined that Coitrone's § 1983 claim failed as a matter of law to the extent this claim was premised upon Coomes's allegedly negligent conduct during the chase because Coitrone appeared to acknowledge that he could not establish a Fourth Amendment violation based upon negligent action. *Id*. at *3 n.6. Assuming that Coomes had intentionally struck Coitrone, the district court then determined that Coomes's use of force was objectively reasonable because 1) the crimes at issue were severe; 2) Coitrone's actions during the chase constituted an immediate threat to the police and to innocent bystanders; and 3) Coitrone was actively resisting or attempting to evade arrest by flight. *Id*. at *4. The district court rejected Coitrone's attempt to analogize this case to *Walker v. Davis*, a case in which this court held that the doctrine of qualified immunity did not protect a deputy who had used deadly force against a motorcyclist who posed "no immediate threat to anyone." *Id*. at *5−6 (quoting 649 F.3d 502, 503 (6th Cir. 2011)). The district court determined that this case was instead more analogous to *Abney v. Coe*, a case in which the Fourth Circuit held that a deputy sheriff's use of deadly force against a motorcyclist who posed a "substantial risk of serious harm" to others did not violate the Fourth Amendment. 2015 WL 2384298, at *6−7 (quoting 493 F.3d 412, 417 (4th Cir. 2007)). The

---

[1]Coitrone also sued Kentucky State Police Captains Bobby D. Murray and Ricki L. Allen, but Coitrone did not oppose the district court's grant of summary judgment in favor of Allen and Murray. Coitrone's complaint against Coomes also included claims of intentional infliction of emotional distress and negligence *per se*, but Coitrone similarly did not oppose the district court's grant of summary judgment with respect to those claims. The claims against Murray and Allen and the claims of intentional infliction of emotional distress and negligence *per se* are not at issue in this appeal.

district court concluded that Coitrone, like the motorcyclist in *Abney* and unlike the motorcyclist in *Walker*, "posed a serious risk of harm to innocent bystanders." 2015 WL 2384298, at *7. Accordingly, the district court held that Coomes's use of force did not violate the Fourth Amendment. *Id*.

The district court held in the alternative that even if Coomes's use of force had violated Coitrone's constitutional rights, summary judgment on Coitrone's § 1983 claim was proper because the doctrine of qualified immunity barred Coitrone's claim. *Id*. at *7−9. The district court reasoned that Coomes was protected by the doctrine of qualified immunity because his conduct did not violate Coitrone's clearly established constitutional rights. *Id*.

The district court also granted summary judgment on Coitrone's state-law negligence and battery claims. The district court held that Coitrone's negligence claim failed as a matter of law because the negligence claim was not viable in light of Coitrone's battery claim for the identical use of "more force against [Coitrone] than permitted by law." *Id*. at *10. The district court concluded in the alternative that Coomes did not owe a duty of care to Coitrone, "who was evading law enforcement." *Id*. The district court also held that Coitrone's battery claim failed as a matter of law. *Id*. at *11.

The district court properly determined that Coomes's use of force did not violate Coitrone's Fourth Amendments rights. Assuming that Coomes intentionally struck Coitrone's motorcycle, Coomes's use of force was objectively reasonable because the governmental interest in ending the immediate and substantial risk that Coitrone's flight posed to the public outweighed the substantial intrusion that Coomes's use of force imposed upon Coitrone's Fourth Amendment rights. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality

of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation omitted). To make this determination, we use "the objective-reasonableness standard, which depends on the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight. . . . The question we must ask is whether, under the totality of the circumstances, the officer's actions were objectively reasonable." *Fox v. DeSoto*, 489 F.3d 227, 236−37 (6th Cir. 2007) (internal citations omitted).

Even though "intentionally ramming a motorcycle with a police cruiser involves the application of potentially deadly force," *Walker*, 649 F.3d at 503−04, and the intrusion imposed on Coitrone's Fourth Amendment interests was substantial, the governmental interest in ending Coitrone's flight outweighed this intrusion because the undisputed facts establish that his flight posed a substantial and immediate danger to the public. In *Scott v. Harris*, the Supreme Court held that law enforcement's use of force that poses "a high likelihood of serious injury or death" to a fleeing individual is reasonable when that force is used in an attempt to terminate a chase that poses "a substantial and immediate risk of serious physical injury to others." 550 U.S. 372, 384, 386 (2007). The Supreme Court held in *Scott* that a deputy's use of potentially deadly force to end the plaintiff's flight from the police was therefore reasonable because a videotape established that the plaintiff had led the police on a chase that placed "police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380, 386. The Supreme Court explained:

> [On the video] we see [the plaintiff's] vehicle racing down narrow,
> two-lane roads in the dead of night at speeds that are shockingly
> fast. We see it swerve around more than a dozen other cars, cross
> the double-yellow line, and force cars traveling in both directions

> to their respective shoulders to avoid being hit. We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up.

*Id.* at 379−80 (internal footnote omitted). The undisputed facts establish that Coitrone, similar to the plaintiff in *Scott*, drove recklessly during the pursuit by driving his motorcycle as fast as 65 to 70 miles per hour, exceeding the speed limit by as much as 25 miles per hour, crossing the double-yellow line, and driving in the left lane of a two-lane road in order to pass vehicles traveling in the right lane. The undisputed facts also establish that Coitrone's reckless driving, like the actions of the plaintiff in *Scott*, posed an immediate and substantial danger to the safety of innocent bystanders because portions of the chase occurred in areas in which other drivers and pedestrians were present. Accordingly, the undisputed facts establish that Coomes's use of potentially deadly force against Coitrone was objectively reasonable because Coitrone, like the plaintiff in *Scott*, initiated a chase that posed a "substantial and immediate risk of serious physical injury to others." 550 U.S. at 386.

In addition to the substantial and immediate danger that Coitrone posed to the public, other considerations relevant to the objective reasonableness analysis indicate that Coomes's use of force against Coitrone was objectively reasonable. Relevant considerations to the objective reasonableness analysis "include the severity of the crime at issue" and whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Fox*, 489 F.3d at 236 (internal quotation marks and citations omitted). The undisputed evidence establishes that Coitrone attempted to evade arrest by flight because he testified that he fled from the police even though he was aware the police wanted him to stop. Accordingly, Coomes's use of force to terminate this dangerous chase was objectively reasonable under the totality of the circumstances because

the governmental interest in ending the substantial and immediate danger that Coitrone's flight posed to the public, in addition to Coitrone's attempt to evade arrest by flight, outweighed the intrusion that Coomes's use of potentially deadly force imposed upon Coitrone's Fourth Amendment interests.

Coitrone contends that Coomes's use of force was unreasonable because Coitrone did not pose an immediate danger to others at the time of the collision. To support this assertion, Coitrone relies on this court's holding in *Walker* that when "a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Walker*, 649 F.3d at 503 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). In *Walker*, this court affirmed the district court's denial of qualified immunity to a deputy who hit and killed a motorcyclist after pursuing the motorcyclist for about five minutes on "empty stretches of highway" and onto a muddy field because the motorcyclist "posed no immediate threat to anyone as he rode his motorcycle across an empty field in the middle of the night in rural Kentucky." *Id.* at 503−04. Coitrone contends that he did not pose an immediate threat to others because at the time that the collision occurred "heavy traffic . . . made any further flight by Coitrone obviously impossible and required Coitrone to begin slowing to a stop." This assertion fails because unlike the collision in *Walker*, which occurred in the middle of the night on an empty field, the collision here occurred on a Sunday morning near a church at which pedestrians and other drivers were present. Further, prior to the collision, Coitrone had exhibited a willingness to endanger others by driving recklessly in order to evade the police. A reasonable officer in Coomes's position would therefore be justified in believing that Coitrone might seriously injure these innocent bystanders by continuing to drive recklessly even though Coitrone had slowed down before he was struck. Accordingly, Coitrone's reliance on *Walker* is

misplaced because Coitrone, unlike the motorcyclist in *Walker*, posed a substantial and immediate danger to innocent bystanders at the time of the collision.

Coitrone also claims that Coomes's alleged violations of KSP policy during the pursuit establish that Coomes's use of force was objectively unreasonable. This argument fails because even if Coomes violated KSP policy during the pursuit, Coomes's violations of KSP policy would not establish that his use of force was unconstitutional. "[T]he Supreme Court has been cautious to draw a distinction between behavior that violates a statutory or constitutional right and behavior that violates an administrative procedure of the agency for which the officials work." *Cass v. City of Dayton*, 770 F.3d 368, 377 (6th Cir. 2014) (internal quotation marks and citation omitted). This court has therefore held that a detective's alleged violations of police department policy were not determinative of whether the detective's use of force was objectively unreasonable. *Id.* As we reasoned in *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992), "[u]nder § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983." Accordingly, Coomes's alleged violations of KSP policy do not change the conclusion that he did not act objectively unreasonably under the circumstances.

Coitrone also argues that an alleged disagreement between Clark and Coomes about when KSP policy required the pursuit to be terminated creates a genuine issue of material fact about whether Coomes's use of force was excessive. This argument is unavailing. Even if Coitrone is correct that Coomes violated KSP policy by pursuing Coitrone after Clark had determined that KSP policy required that the pursuit be terminated, Coomes's alleged violation of KSP policy would not, as stated above, establish that his use of force violated the Fourth

Amendment. Similarly, Clark's alleged belief that Coomes's continued pursuit of Coitrone was unreasonable is not determinative of whether Coomes's use of force violated the Fourth Amendment. "[A]n officer's subjective belief that a particular use of force was unreasonable is no more proof of a constitutional violation than an officer's subjective belief that a particular use of force was reasonable is proof of constitutionality; the test is one of objective reasonableness." *Abney*, 493 F.3d at 420 (citing *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006); *Bond v. United States*, 529 U.S. 334, 338 n. 2 (2000)).

Also unavailing is Coitrone's contention that Coomes's use of force was unreasonable because he was not in full flight at the time of the collision. To support this assertion, Coitrone contends that unlike the suspects in *Scott* and *Abney*, who were both in "full flight" when they were struck by the pursuing officers, Coitrone had "ceased his flight" prior to the collision. *Scott*, 550 U.S. at 375; *Abney*, 493 F.3d at 414. However, the undisputed facts establish that although Coitrone was slowing down, he had not come to a complete stop at the time that Coomes struck him and Coomes had no way of knowing whether Coitrone would flee again, as he had done once after completely stopping his motorcycle.

The district court therefore properly granted summary judgment to Coomes on Coitrone's § 1983 claim.[2]

Dismissal of Coitrone's state-law negligence and battery claims, however, does not automatically follow from the district court's dismissal of the federal claim. First with respect to the negligence claim, the district court adopted the reasoning of *Turner v. Hill* to the effect that a

---

[2]Because Coomes did not violate Coitrone's constitutional rights, we do not reach the issue of whether Coomes is protected from liability by the doctrine of qualified immunity, except to note the Supreme Court's recent observation that the "Court has thus never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Mullenix v. Luna*, 136 S. Ct. 305, 310 (2015).

claim for negligence would not lie for the same excessive force asserted in a battery claim for excessive force used during a lawful arrest. 2015 WL 2384298, at *9−10. In *Turner*, the court reasoned that "[t]o permit a separate claim for negligence premised on the same conduct by the officer is logically and doctrinally unsupportable." *Turner v. Hill*, 5:12−CV−00195−TBR, 2014 WL 549462, at *10 (W.D. Ky. Feb. 11, 2014). The district court also relied on another Western District of Kentucky case that reasoned that "[t]o permit a separate claim for negligence creates the risk that a jury would assume that, even if no excessive force were used, the officer might somehow still be liable for some undefined negligence." *Ali v. City of Louisville*, No. 3:05−CV−427−R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006). The underlying premise of this reasoning is thus that the injury caused by the use of unreasonable force in making an otherwise proper arrest is compensable under a battery cause of action, not that there can be no compensation. Coomes has not cited Kentucky state court cases demonstrating that this approach is correct.

We need not resolve whether this is an accurate statement of Kentucky tort law. For one thing, neither case relied upon by the district court addresses a situation where, as here, the officer asserts that the contact with the suspect was unintentional and the plaintiff alleges violations of traffic laws and the failure to adhere to reasonable police procedures, all circumstances that are more consistent with a negligence claim than a battery claim.

In any event, even assuming that at least portions of Coitrone's negligence claim are subsumed in the battery claim, this still leaves the issue of whether the district court properly dismissed Coitrone's battery claim. This battery claim in turn depends on whether the otherwise privileged use of force to arrest him was reasonable.

This reasonableness determination is not limited to an examination of whether there was probable cause to arrest. The district court did not hold that Coitrone's evasion of law enforcement was by itself sufficient to defeat the battery claim, although one sentence of the district court's opinion could possibly be so read. The district court, however, clearly stated that it had to consider "whether Coomes had had reasonable grounds to believe and did believe in good faith that Coitrone had committed an arrestable offense *and whether Coomes used excessive force in making the arrest.*" 2015 WL 2384298, at *11 (emphasis added). In the next sentence, the district court, based on its previous analysis under federal law, concluded that Coomes's "use of force followed Coitrone's flight from police and wanton endangerment— felonies to which Coitrone has pled guilty." *Id.* We take this to be the district court's determination that Coomes did not use unreasonable force under state law.

It is true that the district court stated that Coomes did not owe a duty to Coitrone under negligence law, but the language in *Walker v. Davis* that the court used to support this conclusion at most questioned whether a police officer owes to a fleeing person "such a duty" as that owed to an innocent bystander. *Id.* at *10 (citing *Walker v. Davis*, 643 F. Supp. 2d 921, 933 n.10 (W.D. Ky. 2009)). This is a long way from stating that a law enforcement officer has no duty at all under negligence law to avoid unnecessary injury to a fleeing person. Apart from the technical question of whether the negligence claim is subsumed in the battery claim, there could be no basis for saying that under negligence principles the privilege to arrest permits any use of force, no matter how unreasonable.

All of this boils down to the question of whether the force applied in this case was or was not unreasonable under Kentucky tort standards. The state standard of course need not be identical to the federal standard. Indeed, the Western District of Kentucky court stated in *Ali*,

2006 WL 2663018, at \*8, that "the analysis of excessive force claims under § 1983 is different from the analysis under state law." The district court's analysis of the Kentucky reasonableness standard in this case is very brief and relies on its analysis under federal law. The parties in their briefing to us do not specifically address the Kentucky standard for what is reasonable under the circumstances. Therefore, assuming that the district court continues to assert supplemental jurisdiction, the district court on remand should determine whether the force was unreasonable under the applicable Kentucky reasonability standard.

In light of the need for further state-law analysis, a remand is appropriate so that the district court may exercise its discretion to determine whether or not to decline supplemental jurisdiction. "Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims. Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) (internal quotation marks and citations omitted). "[T]he Supreme Court's general comity-related principle [is] that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law." *Id*. at 522 (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). "Such a dismissal [would be] of course without prejudice" to Coitrone's ability to bring these claims in state court. *Id*.

Accordingly, we remand this case to the district court so that it can consider whether to grant summary judgment to Coomes on Coitrone's state-law claims under Kentucky tort law, or in the alternative to exercise its discretion to decline supplemental jurisdiction and dismiss those claims without prejudice.