**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DAVID SCOTT, as guardian ad litem
for his minor daughter, S.S.;
ANGELICA SANTANA, as guardian ad
litem for her minor daughter, L.R.;
DEJAH HALL, as guardian ad litem
for her minor daughter, R.H.,
        *Plaintiffs-Appellees*,

v.

COUNTY OF SAN BERNARDINO; LUIS
ORTIZ; ANTHONY THOMAS,
        *Defendants-Appellants*,

ANDREW GARCIA,
        *Defendant*,

ETIWANDA SCHOOL DISTRICT;
BALBINA KENDALL; JANELLA
CANTU-MYRICKS,
        *Cross-Defendants.*

No. 16-55518

D.C. No.
5:14-cv-02490-
VAP-KK

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Chief Judge, Presiding

Argued and Submitted November 13, 2017
Pasadena, California

Filed September 10, 2018

Before:  Jacqueline H. Nguyen and Andrew D. Hurwitz, Circuit Judges, and Richard K. Eaton,[*] Judge.

Opinion by Judge Nguyen

### SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment in an action brought by three middle school girls who alleged that a Sheriff's deputy arrested them on campus without probable cause, in violation of their Fourth Amendment rights and state law.

The middle school's assistant school principal had asked the Sheriff's deputy, a school resource officer, to counsel a group of girls who had been involved in ongoing incidents of bullying and fighting.  After concluding that the girls were unresponsive and disrespectful, the deputy arrested the girls "to prove a point" and "make [them] mature a lot faster."

Applying the two-part reasonableness test set forth in *New Jersey v. T.L.O.,* 469 U.S. 325, 333 (1985), the panel held that the arrests were unreasonable because they were

---

[*]  Richard K. Eaton, Judge for the United States Court of International Trade, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

not justified at their inception nor reasonably related in scope to the circumstances. The panel held that the summary arrest, handcuffing, and police transport to the station of the middle school girls was a disproportionate response to the school's need, which was dissipation of what the school officials characterized as an "ongoing feud" and "continuous argument" between the students. The panel further held that police officers were not entitled to qualified immunity because no reasonable officer could have reasonably believed that the law authorizes the arrest of a group of middle schoolers in order to teach them a lesson or to prove a point.

The panel held that the evidence was insufficient to create probable cause to arrest the students for violating California Penal Code § 415(1) or Cal. Welf. & Inst. Code § 601(a), and that plaintiffs were entitled to summary judgment in their favor on their state false arrest claim.

---

## COUNSEL

Laura L. Crane (argued), Deputy County Counsel; Jean-Rene Basle, County Counsel; San Bernardino County Counsel, San Bernardino, California; for Defendants-Appellants.

Brenton Whitney Aitken Hands (argued), Law Office of Jerry L. Steering, Newport Beach, California, for Plaintiffs-Appellees.

---

# OPINION

NGUYEN, Circuit Judge:

On October 8, 2013, a group of seventh grade girls (twelve and thirteen year-olds) were handcuffed, arrested, and transported in police vehicles from their middle school campus to the police station. An assistant principal had asked a school resource officer, Sheriff's Deputy Luis Ortiz, to counsel a group of girls who had been involved in ongoing incidents of bullying and fighting. School officials gathered the girls in a classroom to wait for Deputy Ortiz. The group included both aggressors and victims, and the school did not identify or separate them. When he arrived on campus, Deputy Ortiz initially intended to verify the information the school had given him and to mediate the conflict. Within minutes, however, Deputy Ortiz concluded that the girls were being unresponsive and disrespectful. He decided to arrest the girls because, as he explained to them, he was not "playing around" and taking them to jail was the easiest way to "prove a point" and "make [them] mature a lot faster." Deputy Ortiz stated that he did not care "who [was] at fault, who did what" because "it [was] the same, same ticket, same pair of handcuffs."

Three of the girls sued the arresting officers and the County of San Bernardino for unlawful arrest in violation of state laws and the Fourth Amendment. The district court denied the defendants qualified immunity and granted summary judgment in favor of the students. We affirm.

# I.

## Factual Background

### A. Events Leading to the Arrests

In September and October of 2013, seventh-grade student L.V. harassed and bullied several classmates, including Plaintiffs L.R. and S.S., at the Etiwanda Intermediate Middle School ("EIS") in Rancho Cucamonga, California. On September 6, 2013, L.V. assaulted L.R. on the school's playground. L.V. approached L.R. during a classroom break, grabbed her hair, and punched her in the face. R.H., the third plaintiff in this case, tried to pull L.V. off L.R. L.R. did not hit L.V. back, but the school suspended both girls. According to L.R.'s mother, Angelica Santana, the Assistant Principal, Balbina Kendall, told L.R. and Santana that it was school policy to suspend any student involved in a fight, regardless of who was at fault.

After the incident, Santana asked school officials for help in filing a police report with the San Bernardino County Sheriff's Department. Deputy Anthony Thomas, a school resource officer, met with L.R. and Santana about the altercation. Santana asked Deputy Thomas about filing a restraining order against L.V. to protect her daughter L.R., but he replied that it would not be "practical" since the girls attended school together.[1] Deputy Thomas also told his colleague, Deputy Ortiz, that he had taken a report regarding a fight on campus, but did not share any further details.

---

[1] Santana maintains that she told Deputy Thomas that her daughter was the victim of L.V.'s aggression, but Deputy Thomas's police report described the fight as "mutual combat."

A few weeks later, L.V. told other students that she was going to assault S.S.  On October 2, 2013, S.S. confronted L.V. and said "[i]f you're going to beat me up, get it over with," and "hit me, bitch."  L.V. made good on her threat by punching S.S., who did not hit L.V. back.  S.S. later successfully asked the school to change her schedule to separate her from L.V.  Over the following weekend, L.V. and another student, A.J., attempted to assault L.R. and S.S. in a local park.  The victims fled, seeking assistance at the home of a stranger, who allowed them to call their parents to pick them up.

## B.  The Arrests

On the morning of October 8, 2013, Santana notified the school that L.V. had attacked her daughter, L.R., over the weekend, and that she was afraid L.V. would attack L.R. again at school.  That same morning, L.R., S.S., and R.H. went together to the school office and asked to speak with someone about L.V.'s bullying and threats.  No administrator was available to speak with them, and the girls were sent to class.  Later, the three girls and two other students, L.V. and A.J., were summoned to a group meeting to discuss the conflict.  Two other students, M.L. and H.P., were brought to the room shortly after.

Assistant Principal Kendall had asked Deputy Ortiz to come to school in order to speak to the students.  Kendall, Deputy Ortiz, and the school's principal, Janella Cantu-Myricks, were present at the meeting.  Kendall told Deputy Ortiz that she had gathered a group of female students who had been involved in an "ongoing feud."  Kendall had previously told Deputy Ortiz that EIS had made multiple unsuccessful attempts to stop the conflict and that the problem was escalating.  Deputy Ortiz had responded to an

"unusually high" number of physical fights between students since the start of the school year.

Kendall addressed the students first, stating that "the threats, the fights after school, the threats [to] fight [at] school . . . this needs to end." She told them "[s]o far as I know, all five . . . all seven of you are, have been part of this continuous argument, on campus and off campus. And that is why the officer, Officer Ortiz, is here today. We are going to put an end to this." Deputy Ortiz then spoke to the students, in an "attempt[] to mediate the problems between the two factions of students and verify[] the information provided" to him by Kendall. Deputy Ortiz quickly formed the view that the students were unresponsive to his efforts and were behaving disrespectfully, based on their "body language and continued whispering." An audio tape of the incident, however, reflects mostly silence in response to Deputy Ortiz's questioning; no student is captured on the audio as speaking loudly or being verbally aggressive.[2]

Within minutes after his arrival, Deputy Ortiz threatened to take all of the students to jail to "prove a point." He told the students, "And for the one lady laughing that thinks it's funny, I am not playing around. I am dead serious that we are taking you guys to jail. That might [be], it might be-is, the most easiest thing to do . . . to wanting to prove a point . . . that I am not playing around. . . . Eventually, maybe, you guys will make it into high school, then I will have to deal

_____

[2] At most, the tape reflects some whispering and quiet giggling from unidentified students. The two students who appeared to be the aggressors in the conflict, L.V. and A.J., both made comments to Deputy Ortiz suggesting that they would not stop their behavior. But no similar statements were made by L.R., S.S., or R.H. Indeed, the transcript shows that none of them spoke until Deputy Ortiz asked if they needed to be handcuffed, after he had initiated their arrests.

with you even more.  Here is a good opportunity for me to prove a point and make you guys mature a lot faster." Deputy Ortiz also said that he did not care "who is at fault, who did what. . . . To me, it is the same, same ticket, same pair of handcuffs."

Deputy Ortiz then announced that he was arresting all of the students for unlawful fighting in violation of California Penal Code § 415.  He called Deputy Thomas for backup, and together the two deputies cited and handcuffed all seven students.  L.R. and S.S. were handcuffed in the classroom, and R.H. was handcuffed outside of the school while waiting for police transport.  Six of the seven girls, including the three Plaintiffs, were driven in police vehicles to the San Bernardino County Sheriff's Department, where they were separated, interviewed, and released to their parents.  L.V.— the alleged aggressor—was released to her father on the school campus.  Deputy Ortiz later stated that he decided to arrest all seven girls, instead of releasing them to their parents, to avoid what he believed would be further disruption to the school's campus, and to prevent potential conflict between the girls' parents.

The school took no disciplinary action against any of the seven students, and no criminal charges were filed.

## C.  The Present Lawsuit

The parents of L.R., S.S., and R.H. sued Deputy Ortiz, Deputy Thomas,[3] and the County of San Bernardino.  The district court granted partial summary judgment to Defendants on several claims, but set the case for trial on the

---

[3] The complaint also named Deputy Andrew Garcia, who was later dismissed from the lawsuit.

students' Fourth Amendment claims, as well as their state law false arrest and imprisonment claims. On the day trial was to begin, the court allowed Plaintiffs to move for summary judgment on the remaining claims based on newly-discovered authority regarding the scope of California Penal Code § 415, which the Defendants had claimed justified the students' arrests. The district court then granted summary judgment to the students. Defendants timely appealed.

## II.

### Standard of Review

We review de novo both the district court's grant of summary judgment and its decision on qualified immunity. *Davis v. City of Las Vegas,* 478 F.3d 1048, 1053 (9th Cir. 2007).

## III.

### Discussion

In determining whether a police officer is entitled to qualified immunity, we ask (1) whether he violated a constitutional right, and (2) whether the right was "clearly established" at the time of the violation. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001). "These two prongs of the analysis need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017).

## A.

## The Fourth Amendment Violation

We begin our analysis with *New Jersey v. T.L.O.*, in which the Supreme Court held that the Fourth Amendment's "prohibition on unreasonable searches and seizures applies to searches conducted by public school officials." 469 U.S. 325, 333 (1985). The Court recognized, however, that "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject," and thus school officials may, under certain circumstances, conduct warrantless searches of students "under their authority." *Id.* at 340. Whether such a search is permissible "depend[s] simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341. A determination of reasonableness requires "a twofold inquiry: first, one must consider 'whether the action was justified at its inception;' second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). *T.L.O.*'s two-part test in the school setting operates as a limited "special needs" exception to the warrant and probable cause requirements of the Fourth Amendment. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) ("A search unsupported by probable cause can be constitutional . . . 'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirements impracticable.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987))).

Though *T.L.O.* dealt with searches, not seizures, we have specifically extended its special needs test to seizures conducted by school officials in the school setting. For example, in *Doe ex rel. Doe v. Hawaii Department of*

*Education*, we applied *T.L.O.* and asked whether a teacher acted unreasonably by taping a student's head to a tree for five minutes.    334 F.3d 906, 909–10 (9th Cir. 2003). Similarly, in *C.B. v. City of Sonora*, we assumed that *T.L.O.*'s reasonableness standard applied to a law enforcement arrest on school grounds.  769 F.3d 1005, 1034 (9th Cir. 2014) (en banc).

Applying the *T.L.O.* two-part reasonableness test,[4] we agree with the district court that the arrests of L.R., S.S., and R.H. were unreasonable because they were not "justified at [their] inception."  *T.L.O.*, 469 U.S. at 341.  The deputies were given only generalized allegations of group bickering and fighting, not specific information about L.R., S.S., or R.H.  At most, Deputy Thomas knew that L.R. had been in a fight on campus one month prior.  *See Ybarra v. Illinois*, 444 U.S. 85, 93–95 (1979) (emphasizing that the Fourth Amendment requires particularized suspicion); *United States v. I.E.V.*, 705 F.3d 430, 433, 435–37 (9th Cir. 2012) (same); *see also Terry*, 392 U.S. at 21 n.18 ("This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.").      Moreover, while the traditional Fourth Amendment analysis "is predominantly an objective inquiry," the "actual motivations" of officers may be considered when applying the special needs doctrine. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (citations omitted).  And, here, Deputy Ortiz's actual motivations are clear—he explicitly told the students that he was arresting

---

[4] As we did in *C.B.*, we assume—without deciding—that *T.L.O.*'s lower standard of reasonableness applies to seizures by law enforcement in a school setting.  *See C.B.*, 769 F.3d at 1034.

them to prove a point and to "teach them a lesson."  Deputy Ortiz told them:

> And for the one lady laughing that thinks it's funny, I am not playing around.  I am dead serious that we are taking you guys to jail. That might be . . . the most easiest thing to do . . . to wanting to prove a point . . . that I am not playing around. . . .  Here is a good opportunity for me to prove a point and make you guys mature a lot faster.    Then, unfortunate [sic] for you guys, you guys will probably now be in the system.  You will have a criminal record.  Just because you guys can't figure something out here.

He continued:

> [H]ere is the thing right now . . . I don't care who is at fault, who did what.  You hear that? I don't care who did what, who is saying what, and whose fault it is.  To me it is the same, same ticket, same pair of handcuffs.

Deputy Ortiz clearly stated that the justification for the arrests was not the commission of a crime, since he did not "care who is at fault," nor the school's special need to maintain campus safety, but rather his own desire to "prove a point" and "make" the students "mature a lot faster."  The arrest of a middle schooler, however, cannot be justified as a scare tactic, a lesson in maturity, or a chastisement for perceived disrespect.  The special needs exception simply "do[es] not apply where the officer's purpose is not to attend to the special need[]" in question.  *al-Kidd*, 563 U.S. at 737. Indeed, where it is "clear from the testimony" of the

arresting officer that the seizure occurred for an impermissible motive, "[t]his alone is sufficient to conclude that [a] warrantless [arrest] [is] unreasonable." *See United States v. Hellman*, 556 F.2d 442, 444 (9th Cir. 1977); *accord United States v. Orozco*, 858 F.3d 1204, 1212–13 (9th Cir. 2017); *see, e.g.*, *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (8th Cir. 2006) (finding the handcuffing of a young student to be unreasonable under *T.L.O.* where the arresting officer "candidly admitted" that he did so "to persuade her to get rid of her disrespectful attitude and to impress upon her the serious nature of committing crimes").

Moreover, even if the arrests had been justified at their inception, we would find that they failed *T.L.O.*'s second prong, as they were not "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341 (quoting *Terry*, 392 U.S. at 20). *T.L.O.* held that a search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342. The summary arrest, handcuffing, and police transport to the station of middle school girls was a disproportionate response to the school's need, which was dissipation of what Vice Principal Kendall characterized as an "ongoing feud" and "continuous argument" between the students.

We do not diminish the seriousness of potential violence between students, or the need for conflict resolution in the educational setting. But "[s]ociety expects that children will make mistakes in school—and yes, even occasionally fight." *E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 183 (4th Cir. 2018). Deputy Ortiz faced a room of seven seated, mostly quiet middle school girls, and only generalized

allegations of fighting and conflict amongst them. Even accounting for what Deputy Ortiz perceived to be non-responsiveness to his questioning, the full-scale arrests of all seven students, without further inquiry, was both excessively intrusive in light of the girls' young ages and not reasonably related to the school's expressed need. Ironically, the primary instigator of the conflicts, L.V., was the only one released to a parent at the school campus.

The foundation of *T.L.O.*'s special needs standard is reasonableness. *T.L.O.*, 469 U.S. at 337; *Doe ex rel. Doe*, 334 F.3d at 909. An arrest meant only to "teach a lesson" and arbitrarily punish perceived disrespect is clearly unreasonable under *T.L.O.* Under the circumstances of this case, we hold that the arrests of the students were unreasonable and in violation of the Fourth Amendment.

## B.

### The Officers Are Not Entitled to Qualified Immunity

"Qualified immunity insulates the officers from liability unless 'existing precedent . . . ha[s] placed the statutory or constitutional question beyond debate.'" *C.B.*, 769 F.3d at 1034 (alterations in original) (quoting *al-Kidd*, 563 U.S. at 741). Though the constitutional right must be clearly established such that "a reasonable official would understand that what he is doing violates that right," *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted), "[t]here need not be a case dealing with these particular facts to find [the officer]'s conduct unreasonable," *Doe ex rel. Doe*, 334 F.3d at 910.

At the time of the students' arrest, it was clearly established that a police seizure at the behest of school officials must, at a minimum, be "reasonably related to its

purpose, and must not be 'excessively intrusive in light of the age and sex of the student and the nature of the infraction.'" *Doe ex rel. Doe*, 334 F.3d at 909 (quoting *T.L.O.*, 469 U.S. at 342). Defendants do not—and indeed, cannot—meaningfully contest Deputy Ortiz's motivation for the arrests, which he stated multiple times. No reasonable officer could have reasonably believed that the law authorizes the arrest of a group of middle schoolers in order to prove a point. *See T.L.O.*, 469 U.S. at 342; *al-Kidd*, 563 U.S. at 737; *see also Gray ex rel. Alexander*, 458 F.3d at 1306.

Defendants cite *C.B. v. City of Sonora*, in which a divided en banc panel of our court found that a reasonable officer, facing "a juvenile who (a) was reportedly a 'runner,' (b) was 'out of control,' (c) ignored the officer's questions, and (d) had not taken his medication, would not have known that taking such a juvenile into temporary custody in order to transport him safely to his uncle was an 'obvious' violation of his constitutional rights." [5]  769 F.3d at 1034. Defendants argue that they could have reasonably interpreted *C.B.* to permit their arrests of the students in this case. But nothing in *C.B.* suggests that an officer may arrest an entire group of students to teach them a lesson or to "prove a point." While the officers in *C.B.* took the troubled student into custody in order to safely transport him into the care of a relative, here, in contrast, Deputy Ortiz admitted that he "did not care" who was at fault in the alleged fighting and arrested all of the students in order to teach them a lesson. Under any standard, the arrests here were

---

[5] Although the arrests here occurred prior to our decision to grant en banc review in *C.B.*, our analysis remains the same because the above-cited portion of the en banc decision is consistent with the earlier three-judge panel opinion.

unreasonable, and the district court properly denied Deputies Ortiz and Thomas qualified immunity.

## C.

### The Officers Lacked Probable Cause to Arrest under State Law

Defendants alternatively argue that Deputy Ortiz had probable cause to arrest the students for violating California Penal Code § 415(1), which criminalizes "unlawfully fight[ing] in a public place or challeng[ing] another person in a public place to fight."

Defendants' reliance on Penal Code § 415(1) is a nonstarter for two reasons. First, § 415(1) does not apply to school grounds; rather, a parallel provision, § 415.5 expressly covers this setting. As a "general rule . . . where the general statute standing alone would include the same matter as" a more specific parallel statute, "and thus conflict with it, the special act will be considered as an exception to the general statute." *See In re Williamson*, 276 P.2d 593, 594 (Cal. 1954) (in bank) (quoting *People v. Breyer*, 34 P.2d 1065, 1066 (Cal. Ct. App. 1934)). Section 415.5 criminalizes unlawful fighting "within any building or upon the grounds of any school," but expressly exempts registered students from its scope. Applying § 415(1) to school grounds would eliminate that exception. *See In re Fernando C.*, 173 Cal. Rptr. 3d 836, 841 (Ct. App. 2014) (explaining that "it would make little sense for the Legislature to have included this exemption for registered students if it intended

such students to be prosecuted for fighting in a public place under the parallel provision of" § 415(1)).[6]

Second, even if § 415(1) applied to school grounds, Deputy Ortiz lacked probable cause to arrest the three Plaintiffs.  Other than general information from school officials about ongoing conflicts between a group of girls, Deputy Ortiz had no information suggesting that L.R., S.S., or R.H. were *individually* responsible as the instigators or aggressors instead of as the victims.[7]  In fact, had Deputy Ortiz even minimally inquired about the circumstances of the conflict, as he initially intended to do, he would have learned that the three Plaintiffs had tried that very morning to report L.V.'s aggression to school administrators.

Defendants also claim that the students' behavior in the classroom justified the arrest because there was reason to believe the students would engage in imminent fights. That assertion is belied by the audio record of the encounter, which "quite clearly contradicts the version of the story told by" the officers. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The students were mostly silent, only speaking to respond to the questions posed to them. But even taking at face value Deputy Ortiz's claim that the girls were being disrespectful

---

[6] Defendants argue that the law on whether § 415(1) could be used against enrolled students was unsettled because *Fernando C.* was decided after the arrests in this case.  But *Fernando C.* merely reiterated the statute's legislative intent and relied on its structure and plain language to restate the law's scope. *See* 173 Cal. Rptr. 3d at 840–41.

[7] While Deputy Ortiz later stated that he recognized "many" of the girls from previous visits to campus, he never identified L.R., S.S., and R.H. as the ones he recognized or stated that they had been involved in previous incidents.

to him, and whispering among themselves, this conduct in no way rose to the level of probable cause that could have justified their arrests.[8]  In short, the evidence available to Deputy Ortiz was wholly insufficient to create probable cause to believe that any one of the three Plaintiff students violated § 415(1).

Finally, Defendants briefly argue that Deputy Ortiz had probable cause to arrest the students for violating California Welfare and Institutions Code § 601.  This section allows a warrantless detention of a minor if there is "reasonable cause" to believe that she is "persistently or habitually refus[ing] to obey the reasonable and proper order or directions of his or her parents, guardian, or custodian, or who is beyond control of that person."  Cal. Welf. & Inst. Code §§ 625, 601(a).    Assuming that EIS could be considered a "custodian" for the purposes of the statute, *but see C.B.*, 769 F.3d at 1040–45 (Berzon, J., dissenting), there was simply no evidence that S.S., L.R., and R.H. were "habitually refus[ing] to obey" the directions of school officials, Cal. Welf. & Inst. Code § 601(a).

Because the arrests of L.R., S.S., and R.H. were unjustified, we also affirm the grant of summary judgment in their favor on the state false arrest claim.    A law enforcement officer cannot be civilly liable for false arrest when "[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest

---

[8] Defendants attempt to shore up their probable cause under a "common enterprise" theory.  But while the Supreme Court has allowed a type of group probable cause in limited circumstances, *see Pringle v. United States*, 540 U.S. 366, 373 (2003), it is clearly inapplicable here, where the Plaintiffs sought assistance from school officials, ran from the aggressor, and inflicted no violence in return.  Under these facts, no inference of collective guilt is justified.

was lawful."  Cal. Penal Code § 847(b)(1).  Lacking both justification and probable cause for their arrests, Defendants cannot avoid liability for false arrest under state law.  *See O'Toole v. Super. Ct.*, 44 Cal. Rptr. 3d 531, 549 (Ct. App. 2006) (noting that § 847 "contains principles that parallel the [qualified] immunity analysis").

**AFFIRMED.**